RENDERED: JUNE 14, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0313-MR


DAVENPORT EXTREME POOLS AND SPAS, INC.,
AND TRACY DAVENPORT                                                  APPELLANTS


|       | APPEAL FROM JEFFERSON CIRCUIT COURT |
|-------|-------------------------------------|
| v.    | HONORABLE JULIE KAELIN, JUDGE       |
|       | ACTION NO. 22-CI-001994             |


ELIZABETH ANN MULFLUR,
MANDY MULFLUR MASTERSON,
THOMAS JAMES MULFLUR; AND
RUSSELL COLEMAN, ATTORNEY
GENERAL OF KENTUCKY[1]                                                APPELLEES


OPINION AND ORDER
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, ECKERLE, AND McNEILL, JUDGES.

---

[1] The Attorney General entered an appearance per Kentucky Rules of Appellate Procedure ("RAP") 22(C)(3) but was not a named party to the appeal. Notably, the AG's brief limited itself to defending the constitutionality of Kentucky's Uniform Public Expression Protection Act; it did not address any substantive claims.

ECKERLE, JUDGE:  The central issue in this case is whether Kentucky's Uniform Public Expression Protection Act ("UPEPA") applies retroactively or violates the jural rights doctrine.  We hold that the legislation is a procedural or remedial change that does not alter or abolish any common-law right of recovery; hence, it applies retroactively and does not violate jural rights.  We find that the Trial Court properly dismissed the case and granted attorneys' fees.  Accordingly, we affirm.

**BACKGROUND**

Appellants, Davenport Extreme Pools and Spas, Inc. and Tracy Davenport (collectively "Davenport"), filed a Complaint against Appellees, Thomas James Mulflur, Elizabeth Ann Mulflur, and Mandy Mulflur Masterson (collectively "Mulflurs").  Davenport later filed an Amended Complaint adding Keith Judd and Carla Judd (collectively, "Judds") as defendants.  Davenport generally claims that Mulflurs were "on a mission to destroy" Davenport after a deal to construct and install a pool did not go as planned.

From the allegations, it appears that in the summer of 2021, Appellees, Thomas and Elizabeth Mulflur, contracted with Davenport to build a pool and hot tub at their residence in Louisville, Jefferson County, Kentucky.  All parties agree that neither hot tub nor pool was ever constructed.  It appears that Thomas and Elizabeth Mulflur attempted twice to cancel the contract with Davenport, potentially due to delays in construction.  As the project was already

-2-

paid for in full, Davenport offered to return half of the funds paid as the contract provided that the other half constituted a non-refundable deposit. Both sides became litigious; a separate lawsuit against Davenport, and criminal charges Davenport recently settled, *see* Slip Op. p. 9, *infra*, are not the subject of the instant appeal, though.

As it concerns Judds, their contract with Davenport did conclude with a completed pool. Nonetheless, they appear to have been dissatisfied with the time that it took to complete the project. It appears that Carla Judd, Elizabeth Mulflur, and Mandy Mulflur Masterson then communicated over social media and through private means about their experiences with Davenport. While Judds and at least some Mulflurs[2] were expressing to others displeasure with their Davenport experiences, Davenport claims that Judds and Mulflurs ultimately conspired to influence Bradley and Jocelyn Jones (collectively, "Jones"), then-existing Davenport customers under an active contract to construct a pool, to cancel. The Jones's contract contained a complete build price of $97,770, and the Joneses ultimately forfeited the already-paid sum of approximately $39,000 to cancel the contract. The Joneses claimed that they canceled the contract because they were expecting significant, intensive care charges for their soon-to-arrive baby.

---

[2] Though we refer generally to Mulflurs, it does not appear that Thomas Mulflur made any complained-of defamatory statements.

Davenport, citing to no supporting facts, alleges the Joneses should have anticipated these expenses. Accordingly, Davenport alleged that Mulflurs committed acts of tortious interference with contractual relations, tortious interference with a prospective business advantage, and defamation. Davenport asserted that these acts occurred when Mulflurs allegedly contacted the Joneses and convinced them either to refrain from doing business with Davenport or to cancel contracted business. Davenport also alleges that Mulflurs falsely accused Davenport of fraud, dishonesty, and untrustworthiness. Davenport sought millions of dollars in damages from Mulflurs.[3]

The Trial Court extensively quoted the communications that were the subject of this lawsuit, and we repeat that language here:[4]

- Carla Judd to Mandy Masterson, undated communication:

> Hey there Mandy! Carla Judd here. I've had someone in the neighborhood reach out to me asking about Davenport pool company [sic]. She bought Kim Carpenter's house which was under contract with Davenport. She hasn't heard a single thing from them and is asking me about them. I'm in FL not back until tomorrow and will have a conversation with her about it but wanted to offer her your brother's contract if they are still pursuing action. I will encourage her to do everything possible to get out of the contract before

---

[3] Judds have since settled their disputes and are not included in the instant action.

[4] We include Judd's statements to provide a complete picture of the communications. Also, all quotations are from the Trial Court's Order, including all alterations, errors, usage of "sic," and ellipses.

-4-

ground is broken.  Ours is still only about ½ done.  We were May/June 2021 estimated completion.  Still not close.

- Mandy Masterson response to Carla Judd, undated communication:

  They are a piece of work . . . my brother filed a lawsuit along with another company . . . they didn't want to do mediation so they are going to court . . . they ran ads During [sic] super bowl . . . mind boggling.

- Elizabeth Mulflur to Carla Judd, February 20, 2022:

  Carla,
  This is Elizabeth Mulflur, Mandy's sister in law [sic] going through Davenport Pool Hell!  Please share our contact info . . . [. . .] We filed a lawsuit, but we learned civil court is out a year plus on scheduling so we're going to arbitration, first step is mediation.  Steven Pence is our lawyer.  I'll help however I can as they do need to try to get out of their contract.  They can reach out anytime! Thanks [sic]

- Carla Judd response, undated:

  I really appreciate your reaching out and will absolutely pass along your contact info.  I wish we could join you, but as I told Mandy back a few months ago, we are too far in now to turn around.  My husband is DONE & I'm just trying to keep the peace to get the job done.  I'm holding onto hope despite it making little sense to anymore.  Anyway.  Thanks again and I'll at least put Jocelyn Jones in touch with you.  Who knows, maybe you'll hear from us next.

- Elizabeth Mulflur's reply:

  Thank you.  I can share, Thursday Pools may have some obligation to you as they license and endorse them to install their pools.  I am more than willing to ask Pence

his thoughts.  He'll provide an initial advisory call with no obligation.  If I can help you, I will.  They are snarky, unprofessional and embarrassing for me to say that I signed their contract.  Ugh!  Enough of that – enjoy FL!!!  Safe travels.

- Elizabeth Mulflur to Carla Judd, March 4, 2022:

    Hi Carla – Happy Friday!  This is Elizabeth (Mandy's sister in law [sic]).  Just wanted to let you know that the Jones' spoke with our attorney, Steve Pence.  While he is not going to represent them, he did refer them to another firm.  Steve did ask if you and your husband would be open to talking with him?  He thinks this Davenport company is running a Ponzi scheme and would like understand [sic] the details of your experience.  Would you be open to a brief call?  Let me know and I can share his number or share yours with him.  Thank you!

- Carla Judd response, undated:

    Hey there!  Jocelyn texted a week or so ago and [said] after consulting with another attorney, they were unfortunately going to walk away from all the money they'd already put into the project.  Magically, Davenports [sic] we're ready to dig and the Joneses said no.  We've had a little bit more progress here after pitching another fit and then crickets again . . . even on a day as nice out as today.  I honestly think this thing is taking years off my life.  My husband Kevin and I do not think Steven Pence is wrong.  Kevin is fine with talking to Steve.  He asked me to share his number . . .

- Elizabeth Mulflur's reply to Judd, March 8, 2022:

    Hi Carla, so sorry to bother you, but could you see if the Jones [sic] may be interested in chatting with me?  I just wanted to share that I've found a contractor that shared would [sic] put in our pool if we can't get all of our money back.  They are endorsed by Mandy's sisters [sic]

Pool [sic] builder in Carmel. . . We're going to entertain getting our pool shell and equipment, whatever the Davenport thugs can prove they've lost or are out of pocket to try to steal our money . . . if not, no worries but I hate seeing them let Davenport keep so much money for doing nothing about doing nothing! Thanks

- An hour later, Elizabeth Mulflur further replied:

  Thank you. Enjoyed chatting with you. Just wish it was better circumstances. Good luck wrangling Davenport.

- Additionally, Elizabeth Mulflur made the following social media posts:

  [May 5, 2022, on Facebook]
  Asher I was [sic] referred to you as a customer posting on Davenport Pools site with a new pool installed this sp[ring.] May I ask how your experience was?

  We are not having a good experience.

  [Anchorage Moms]
  Julia, I was referred to you as someone that posted as a Davenport Pool customer in spring of 21 with a comm. . . Fall install. May I ask how your experience was?

  We are not having a good experience.

  [March 31, 2022]
  Don't use Davenport Extreme pools.

  [October 13, 2021]
  Has anyone had any experience with Davenport Extreme Pools?

The Trial Court found that "[t]his is the extent of the communications in the record relating to [Davenport]'s claims." Opinion, p. 9.

The Trial Court also detailed the timeline and actions relating to the Joneses' cancelation of their pool contract:

> On or about February 28, 2022, Brad Jones emailed Ms. Davenport requesting a full refund of the $79,816 paid for pool installation. On March 1, 2022, [Davenport's] counsel emailed Mr. Jones and advised, by way of an attached letter, there were not "3 current lawsuits" against Davenport; that the down payment is nonrefundable; and that Davenport remained ready to proceed with installation. Mr. Jones responded, acknowledging forfeiture of the $39,000 deposit, but requested a refund on the remaining $39,908. He cited the need to this money to pay anticipated medical bills relating to NICU care for a baby expected to be born within a few days.[ ] [Davenport] cite[s] Mr. Jones' attempt to cancel his contract with Davenport as evidence Ms. Mulflur and Ms. Judd successfully convinced at least one other Davenport customer to extricate from a pool installation contract.

Shortly after Davenport filed the Complaint in the instant case, new legislation went into effect that permitted expedited motions to dismiss on claims such as those raised by Davenport. Soon thereafter, Mulflurs utilized this new procedure and moved to dismiss all claims. The legislation, discussed in more detail below, permits dismissal of claims when a person is exercising free speech and petition rights about a matter of public concern. The Trial Court ultimately dismissed all of Davenport's claims and awarded Mulflurs attorney's fees in accordance with the new legislation. Davenport appealed the dismissal of the Complaint and the award of attorney's fees. Davenport also raised issues

-8-

regarding the constitutionality of the statutes relied upon by the Trial Court. The Attorney General intervened and filed a brief arguing in support of the legislation's constitutionality.

Just days before oral arguments in the instant case, Mulflurs filed a notice to take judicial notice of documents purporting to show that Tracy Davenport had entered guilty pleas and was sentenced to various crimes in Indiana, ostensibly relating to business dealings similar to those in the instant case. At oral arguments, counsel for Davenport objected to us taking judicial notice of the documents. Curiously, though, counsel for Davenport informed this Court during his oral argument that Tracy Davenport was now incarcerated. During oral arguments we declined to take judicial notice of the documents as they are not "true cop[ies] of the authenticated court record[,]" *Marchese v. Aebersold*, 530 S.W.3d 441, 447 (Ky. 2017), Kentucky Rules of Evidence 201, and they are irrelevant to the instant analysis. Accordingly, our review of the issues before us is based on the information contained within the certified record.

We begin our analysis with an explanation of the new legislation.

## ANALYSIS

Strategic Lawsuits Against Public Participation, ("SLAPP"), are used by businesses or persons "to harass, intimidate or silence those individuals who use their right to petition." *Seiller Waterman, LLC v. Bardstown Capital Corp.*, 643

S.W.3d 68, 79 (Ky. 2022). The anti-SLAPP laws generally permit "the person who exercised his or her petitioning right[] to file a motion to strike or dismiss because the case involves protected speech on a matter of public concern." *Id*.

Kentucky recently adopted a version of the UPEPA, an anti-SLAPP measure. KRS[5] 454.460-454.478. The legislation "establish[es] procedures for dismissing legal actions filed in response to a party's exercise of free speech, right to petition, or right to association." *Seiller Waterman*, 643 S.W.3d at 80. Many states have adopted anti-SLAPP legislation and other such legislation protecting free expression, "underscor[ing] that protection of the First Amendment right to petition is crucial and requires vigilance." *Id*. Kentucky's version includes an appellate mechanism that "allow[s] a party to appeal, as a matter of right, any order granting or denying a motion to dismiss filed in conjunction with this statute." *Id*.

That appellate mechanism was used here by the non-prevailing party. Thus, we must first determine the appropriate standard of review for statutory appeals under the UPEPA. There is no established law in Kentucky regarding appeals of this sort, and we believe that the *de novo* standard of review is most appropriate. Notably, and as discussed in detail below, the UPEPA is most akin to an expedited motion to dismiss for failure to state a claim upon which relief may be granted or a motion for summary judgment. Appellate review of either of those

---

[5] Kentucky Revised Statutes.

motions is *de novo*. *See, e.g.*, *Fox v. Grayson*, 317 S.W.3d 1, 7 (Ky. 2010) ("Since a motion to dismiss for failure to state a claim upon which relief may be granted is a pure question of law, a reviewing court owes no deference to a trial court's determination; instead, an appellate court reviews the issue de novo."), and *3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metropolitan Sewer District*, 174 S.W.3d 440, 445 (Ky. 2005) ("Because summary judgments involve no fact finding, this Court will review the circuit court's decision *de novo*.") (citing *Blevins v. Moran*, 12 S.W.3d 698, 700 (Ky. App. 2000)). Accordingly, we likewise review *de novo* the Trial Court's decision to grant or deny a motion filed under the UPEPA.

## I.     Does the UPEPA apply retroactively?

Davenport first argues that the UPEPA should not apply retroactively. We disagree and hold that the statutory scheme does apply retroactively because it is a procedural or remedial change, not a retrospective change that impairs vested rights, attaches a new disability, or imposes a new duty to past occurrences.

Our General Assembly has provided a general rule of statutory interpretation regarding retroactivity, with KRS 446.080(3) unambiguously stating, "No statute shall be construed to be retroactive, unless expressly so declared." Facially, the UPEPA statutes do not contain express language regarding retroactivity. KRS 454.460-454.478. We note that a panel of our Court, in *obiter*

-11-

*dictum* has recently indicated that Kentucky's version of the UPEPA should not apply retroactively based solely on KRS 446.080(3). *Ramler v. Birkenhauer*, 684 S.W.3d 708 (Ky. App. 2024). We are not bound by this *dictum*; and with the issue fully before us on this appeal, we use a different analysis to arrive at a separate conclusion.

We conclude so because KRS 446.080(3) has been interpreted to apply only to retrospective laws, not procedural or remedial changes:

> A retrospective law, in a legal sense, is one which takes away or impairs vested rights acquired under existing laws, or which creates a new obligation and imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past. Therefore, despite the existence of some contrary authority, remedial statutes, or statutes relating to remedies or modes of procedure, which do not create new or take away vested rights, but only operate in furtherance of the remedy or confirmation of such rights, do not normally come within the legal conception of a retrospective law, or the general rule against the retrospective operation of statutes. In this connection it has been said that a remedial statute must be so construed as to make it effect the evident purpose for which it was enacted, so that if the reason of the statute extends to past transactions, as well as to those in the future, then it will be so applied although the statute does not in terms so direct, unless to do so would impair some vested right or violate some constitutional guaranty.

*Peabody Coal Co. v. Gossett*, 819 S.W.2d 33, 36 (Ky. 1991) (quoting 73 AM. JUR. 2d *Statutes* § 354 (1974)). In other words, a statute may apply retroactively, even to events that occurred prior to the statute's effective date and in the absence of

-12-

express language so declaring, if the statute amends "in-court procedures and remedies which are used in handling pending litigation[.]" *Commonwealth Dep't of Agriculture v. Vinson*, 30 S.W.3d 162, 169 (Ky. 2000) (citing *Peabody*, *supra*).

Kentucky's UPEPA statutes fall squarely in the procedural category; they provide procedures that permit expedited consideration of already-existing substantive protections. *Cf. Cordova v. Cline*, 396 P.3d 159, 166-67 (N.M. 2017) ("While the Anti-SLAPP statute provides the procedural protections Petitioners require, the *Noerr-Pennington* doctrine is the mechanism that offers Petitioners the substantive First Amendment protections they seek."). Kentucky's UPEPA statutes permit a special motion for expedited relief to dismiss with prejudice a cause of action. KRS 454.464, 454.472. A party who is served with a "complaint, crossclaim, counterclaim, third-party claim, or other pleading that asserts a" relevant cause of action, may, within 60 days of service (or later with good cause shown), file a "special motion for expedited relief to dismiss the cause of action in whole or in part." KRS 454.464. The filing of motions is purely procedural and in no way alters or impairs vested rights.

Once the motion is filed, the proceedings are stayed. KRS 454.466. Limited discovery is permitted during the stay for the purpose of "establish[ing] whether a party has satisfied or failed to satisfy a burden under KRS 454.472(1)[.]" KRS 454.466(4). Neither of these provisions impairs or alters vested rights. The

former simply pauses the process while the UPEPA expedited motion is decided, and the latter concentrates the discovery proceedings on the central, substantive issue before the Trial Court, namely whether free expression rights are violated. The limited discovery rule permits – indeed, it *requires* – the Trial Court to grant discovery under certain circumstances, such as where:

> . . . a party shows that specific information is necessary to establish whether a party has satisfied or failed to satisfy a burden under KRS 454.472(1) and the information is not reasonably available unless discovery is allowed, including but not limited to situations where a witness may be unavailable or records may have been destroyed.

KRS 454.466(4). This rule is broadly worded to permit parties to use discovery to prove the limited issue before the Trial Court. Here, Davenport does not appear to have even attempted to use this mechanism. However, as the stay and limited discovery were available, no vested rights were impaired or altered.

Additionally, no vested rights are impaired or altered because the limited issue under the UPEPA is whether the burden under KRS 454.472(1) has been met, and that burden aligns with pre-existing procedural mechanisms. KRS 454.472 requires satisfaction of three prongs before granting the motion to dismiss. In the first two prongs, the moving party must establish that the cause of action arose during, or relates to, one of the three covered classes of communication, KRS

-14-

454.462(1)(a)-(c), and the non-moving party must fail to establish that one of the ten, exclusionary instances applies, KRS 454.462(2)(a).

These first two prongs are simply classification prongs that do not alter or impair any vested rights. They merely ask the following question: Do the facts and the claims in this case fall under certain categories of free expression? Resolution of this question alters nothing about the claims before the Trial Court.

The third and final prong regards the proof that the parties must demonstrate:

1. The responding party fails to establish a *prima facie* case as to each essential element of the cause of action; or

2. The moving party establishes that:

a. The responding party failed to state a cause of action upon which relief can be granted; or

b. There is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the action.

KRS 454.472(1)(c)1.-2. These burdens of proof do not alter the standards currently existing in the Kentucky Rules of Civil Procedure ("CR"). Parties can already file motions to dismiss, CR 12.02, and motions for summary judgment, CR 56, which are analyzed under the *de novo* standards announced in KRS 454.472(1)(c)2.a. and b. respectively (and mentioned above). And, as it regards

KRS 454.472(1)(c)1. and a need to establish a *prima facie* showing of each,

essential element of the causes of action, we note that we have previously defined a

*prima facie* case as that:

> . . . which if unrebutted or unexplained is sufficient to maintain the proposition, and warrant the conclusion to support which it has been introduced but it does not shift the general burden of proof, and stands only until the contrary is shown.

*Kroger Limited Partnership I v. Boyle County Property Valuation Administrator*,

610 S.W.3d 332, 337 (Ky. App. 2020) (quoting *Prudential Ins. Co. of Am. v.

Tuggle's Adm'r*, 254 Ky. 814, 72 S.W.2d 440, 443 (1934)). This requirement is

already subsumed into the standards for dismissals and summary judgments. *See,

e.g.*, *Hinners v. Robey*, 336 S.W.3d 891, 895 (Ky. 2011) (noting that on a motion

to dismiss for lack of jurisdiction, the plaintiff "'need only make a *prima facie*

showing of jurisdiction'") (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257,

1262 (6th Cir. 1996)); *Brown v. Griffin*, 505 S.W.3d 777, 783 (Ky. App. 2016)

(upholding a grant of summary judgment because "Brown failed to establish a

*prima facie* case of medical negligence – duty, breach and consequent injury").

Accordingly, no vested rights are altered or otherwise impaired.

Finally, KRS 454.478 requires the court to award court costs,

reasonable attorney's fees, and reasonable litigation expenses related to the motion

in certain circumstances. KRS 446.080 does not apply to such remedial measures.

*Central Kentucky Production Credit Ass'n v. Smith*, 633 S.W.2d 64 (Ky. 1982).

Accordingly, the UPEPA statutes *in toto* are procedural or remedial and may apply retroactively.

Our conclusion that Kentucky's UPEPA statutes are solely procedural is supported by similar conclusions reached in Federal Courts. When sitting in diversity, Federal Courts apply state substantive law and federal procedural law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). *See also Gasperini v. Ctr. For Humans, Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996); *Hanna v. Plumer*, 380 U.S. 460, 465, 85 S. Ct. 1136, 1141, 14 L. Ed. 2d 8 (1965). To that end, many Federal Courts have elected not to apply states' anti-SLAPP dismissal statutes because the Courts have concluded the anti-SLAPP laws are procedural, not substantive. Such Federal Courts have determined that litigants may instead utilize established, federal procedures, namely Federal Rules of Civil Procedure ("FRCP") 12 and 56, to file motions to dismiss and for summary judgment, respectively. *See, e.g.*, *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) (holding that California's special motion to strike in its anti-SLAPP statute answers the same question as FRCP 12 and 56 and is thus procedural); *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019) (holding that the Texas anti-SLAPP statute "'deals only with the conduct of the lawsuit; it creates no rights independent of existing legislation'") (quoting *Makaeff v. Trump University,*

*LLC*, 715 F.3d 254, 273 (9th Cir. 2013) (Kozinski, C.J., concurring)); *Carbone v.*

*Cable News Network, Inc.*, 910 F.3d 1345, 1347 (11th Cir. 2018) (holding that

Georgia's anti-SLAPP statute is "a special procedural device"); *Los Lobos*

*Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 670 (10th Cir. 2018)

(holding that "one cannot reasonably read the language of the New Mexico anti-

SLAPP statute as providing a defendant with a substantive defense to SLAPP

liability"); *Intercon Sols., Inc. v. Basel Action Network*, 791 F.3d 729 (7th Cir.

2015); *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1333-34 (D.C. Cir.

2015) (holding, in an opinion authored by now-United States Supreme Court

Justice Kavanaugh, that the D.C.'s anti-SLAPP Act's special motion to dismiss

cannot be applied in Federal Court).  As a notable summary regarding the Federal

Courts interpretation of California's anti-SLAPP legislation:

> The anti-SLAPP statute creates no substantive rights; it merely provides a procedural mechanism for vindicating existing rights.  The language of the statute is procedural: Its mainspring is a "special motion to strike"; it contains provisions limiting discovery; it provides for sanctions for parties who bring a non-meritorious suit or motion; the court's ruling on the potential success of plaintiff's claim is not "admissible in evidence at any later stage of the case"; and an order granting or denying the special motion is immediately appealable.  *See* Cal. Civ. Proc. Code § 425.16.  The statute deals only with the conduct of the lawsuit; it creates no rights independent of existing litigation; and its only purpose is the swift termination of certain lawsuits the legislators believed to be unduly burdensome.

*Makaeff*, 715 F.3d at 273 (Kozinski, J., concurring). Kentucky's UPEPA statutes are remarkably similar. Accordingly, because Kentucky's UPEPA statutes constitute remedial or procedural changes, they may apply retroactively. The Trial Court did not err in so finding.

**II. Does the UPEPA violate the jural rights doctrine?**

Davenport next argues that the UPEPA statutes violate the jural rights doctrine. The jural rights doctrine is derived from Sections 14, 54, and 241 of the Kentucky Constitution. *Williams v. Wilson*, 972 S.W.2d 260 (Ky. 1998); and *Ludwig v. Johnson*, 243 Ky. 533, 49 S.W.2d 347 (1932). The jural rights doctrine prohibits the General Assembly from abolishing or restricting a common-law right of recovery for wrongful death or personal injury, including defamation claims, existing prior to the adoption of the Commonwealth's Constitution in 1891. *Waugh v. Parker*, 584 S.W.3d 748, 754 (Ky. 2019); *Williams*, 972 S.W.2d at 266 (citing *Fireman's Fund Ins. Co. v. Gov't*, 635 S.W.2d 475, 477-78 (Ky. 1982)); *Taylor v. King*, 345 S.W.3d 237, 242 (Ky. App. 2010).

As we held in Section I, *supra*, the UPEPA statutory scheme is procedural or remedial in nature. It permits parties an accelerated procedure for using established, substantive defenses to dismiss non-meritorious claims. It grants plaintiffs limited discovery to make *prima facie* showings of the elements of

their claims. No pre-existing rights of recovery are abolished or restricted.

Accordingly, the UPEPA statutes do not violate the jural rights doctrine.

### III. Do the instant communications fall under the UPEPA?

Davenport next argues that the communications giving rise to the claimed causes of action should not be protected by the UPEPA. Davenport first appears to argue that the communications do not fall under KRS 454.462(2)(a)3. We agree, but the result of the communications not falling within that portion of the statute is that the UPEPA's procedural protections may be invoked by the Appellees. KRS 454.462(2)(a)3. is an exclusionary clause. Causes of action that fall under it are excluded from UPEPA's protections. That particular provision excludes causes of action asserted "[a]gainst a person primarily engaged in the business of selling or leasing goods or services if the cause of action arises out of a communication or lack of communication related to the person's sale or lease of the goods or services[.]" *Id.* Here, the exclusion does not apply. The cause of action was the opposite – the business instituted a cause of action against the customer. Accordingly, this exception to UPEPA's application does not prohibit the UPEPA's procedural protections from being invoked.

Continuing, Davenport also summarily argues that the UPEPA only applies to public expression, not private expression. Davenport's only legal support for this argument is a citation to a New York Civil Court opinion

interpreting the following provision from New York's anti-SLAPP legislation: "(1) any communication in a place open to the public or a public forum in connection with an issue of public interest[.]" N.Y. Civ. Rights Law § 76-a (McKinney 2020); and *Balliet v. Kottamasu*, 76 Misc.3d 906, 923, 175 N.Y.S.3d 678 (N.Y. City Civ. Ct. 2022), *aff'd sub nom. Balliet v. Kottamasu*, 81 Misc.3d 132(A), 200 N.Y.S.3d 647 (N.Y. Sup. App. Term. 2023). The Court in *Balliet* held that a private chat between five persons in an apartment, even when repeated on their five-person e-mail chain, did not rise to the level of a communication in a place open to the public or a public forum.

Kentucky's UPEPA statute is not so narrow. Our General Assembly drafted it to apply broadly to "a cause of action asserted against a person based on the person's: . . . (c) Exercise of the right of freedom of speech or of the press . . . on a matter of public concern." KRS 454.462(1)(c). Kentucky's protections encompass all speech and press, public or private, and in all forums, about matters of public concern, while New York's anti-SLAPP legislation is limited to communications in places open to the public or to public forums.

The broadness of Kentucky's UPEPA provisions is explicit in KRS 464.462(2)(b)1., which applies UPEPA's procedures to the following causes of action:

> . . . against a person arising from any act of that person, *whether public or private*, related to the gathering,

-21-

receiving, posting, or processing of information for communication to the public, *whether or not the information is actually communicated to the public*, for the creation, dissemination, exhibition, or advertisement or other similar promotion of a dramatic, literary, musical, political, journalistic, or otherwise artistic work, including audio-visual work regardless of the means of distribution, a motion picture, a television or radio program, or an article published in a newspaper, Web site, magazine, or other platform, *no matter the method or extent of distribution*[.]

*Id*. (emphasis added). Furthermore, UPEPA's scope offers express coverage for the following type of claims, relevant to this action:

An action against a person related to the communication, gathering, receiving, posting, or processing of consumer opinions or commentary, evaluation of consumer complaints, or reviews or ratings of businesses.

KRS 454.462(2)(b)2. The statute's drafters clearly intended the procedures to apply widely to expressions both public and private, especially speech relating to consumer opinions, commentary, complaints, reviews, and ratings of businesses. Accordingly, we reject Davenport's narrow reading, and we agree with the Trial Court that the statements herein fall under the UPEPA's procedural provisions.

**IV. Should the Trial Court have dismissed the tortious interference claims?**

Davenport next argues that the Trial Court erred by dismissing the tortious interference claims. To sustain a cause of action for tortious interference with a contract, one must prove six elements:

-22-

1. [T]he existence of a contract;

2. [D]efendant's knowledge of the contract;

3. [D]efendant's intent to cause a breach of that contract;

4. . . . [D]efendant's actions in fact caused a breach of the contract;

5. . . . [P]laintiff suffered damages as a result of the breach; and

6. . . . [D]efendant enjoyed no privilege or justification for its conduct.

*Seeger Enterprises, Inc. v. Town & Country Bank and Trust Co.*, 518 S.W.3d 791, 795 (Ky. App. 2017) (quoting *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6-7 (Ky. App. 2012)).

Likewise, one must prove six elements to sustain a claim of tortious interference with a prospective business advantage:

1. The existence of a valid business relationship or expectancy;

2. Defendant's awareness of the relationship or expectancy;

3. Defendant interfered intentionally;

4. The motive behind the interference was improper;

5. Causation; and

6. Special damages.

*Snow Pallet*, 367 S.W.3d at 6. Analysis of these elements focuses primarily on motive; "[t]o prevail under this theory of liability, the 'party seeking recovery must show malice or some significantly wrongful conduct.'" *Id.* (quoting *National*

*Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988)).

Here, Davenport weaves together the previously-quoted statements made by Carla Judd, Elizabeth Mulflur, and Mandy Mulflur Masterson to construct a case for tortious interference under either legal theory. Davenport points to one contract that was canceled by Brad Jones, forfeiting a $39,000 deposit and requesting a refund on his remaining $39,908 to pay medical bills for his baby, who was expected to be born within days. The Trial Court rejected Davenport's theory of a *prima facie* case to prove either tortious interference claim under these facts. The Trial Court noted that while some statements "express [a] willingness to engage in potentially tortious behavior[,]" the statements "are not actionable in and of themselves[.]" Order at 10. Moreover, Davenport failed to make a causal connection between any of the statements and Jones's cancellation of the contract:

> To this end, it is incumbent on [Davenport] to either ask for limited discovery to substantiate their suspicion or submit communications they already possess to do the same. Since [Davenport] exercised neither option, they have not made *prima facie* cases on their tortious interference claims.

*Id.*

Mulflurs note that Davenport has not alleged that Tom Mulflur made any actionable statements. Regarding Mandy Mulflur Masterson's statements, Mulflurs note that she only indicated that she connected or attempted to connect

the Joneses with Elizabeth Mulflur. The mere giving of contact information from one party to another, absent any other evidence, does not establish causation under either tortious interference theory.

Regarding Elizabeth Mulflur's statements, Mulflurs argue that they only show that Elizabeth Mulflur encouraged the Joneses to cancel their contract with Davenport lawfully, not to breach their contract. Mulflurs note that the Joneses eventually filed a lawsuit against Davenport, attempting to escape their contract by lawful means. The Trial Court agreed, finding the statements showed, at worst, a willingness to engage in potentially tortious behavior.

We agree. The statements do not evince malice or significantly wrongful conduct. *Snow Pallet*, *supra*. They express opinions between allegedly aggrieved parties based on known facts between the parties. And, more significantly, they show no causal relationship between the Joneses' cancelation of their contract and any of the statements made. At worst, they show that Elizabeth Mulflur wanted the Joneses to cancel their contract. However, the Joneses expressly stated they canceled their contract due to the extraordinary expenses of their child's birth – charges one would hardly anticipate incurring – and were willing to forfeit almost $40,000 in the process. And even if Elizabeth Mulflur's statements somehow influenced the Joneses to cancel their contract, Elizabeth Mulflur personally gained nothing from the cancelation. The Joneses did not

become customers of Elizabeth Mulflur. And no malice can be shown by the Joneses lawfully forfeiting a sizable deposit to Davenport for doing no work. As the Trial Court found, Davenport needed more evidence to make its case, and Davenport could have and should have utilized the limited discovery provisions to make *prima facie* cases of the tortious interference claims. Having failed to present at least some *prima facie* evidence of those claims, particularly regarding causation, the Trial Court properly granted the motion in favor of the Mulflurs.

**V.    Should Tracy Davenport's defamation claim have been dismissed?**

Davenport next argues that the Trial Court erred by dismissing the defamation claim. Initially, we hold that the Trial Court did not err by finding Davenport failed to make a *prima facie* case as it relates to Thomas Mulflur. Davenport points to no statement that Thomas Mulflur made that constitutes defamation, and in its Reply Brief Davenport all but concedes the same, arguing that discovery was necessary to "reveal[]" such supposed statements.

As it relates to Elizabeth Mulflur and Mandy Mulflur Masterson, Davenport argues that each woman made statements that were defamatory *per se* regarding Tracy Davenport. Specifically, Davenport claims a cause of action based on Elizabeth Mulflur's statements calling Davenport "thugs," "snarky, unprofessional," and "embarrassing," her statement that the Davenports were "try[ing] to steal our money," and her statement repeating her attorney's opinion

-26-

that the Davenports were operating a Ponzi scheme. Davenport also claims Mandy

Masterson's statement calling Davenport "a piece of work" implies undisclosed,

defamatory facts as a basis for those opinions, thus constituting actionable

defamation.

Four elements are necessary to establish a defamation action in

Kentucky: (1) defamatory language; (2) about the plaintiff; (3) that is published;

and (4) that causes injury to reputation. *Gilliam v. Pikeville United Methodist*

*Hosp. of Kentucky, Inc.*, 215 S.W.3d 56, 60 (Ky. App. 2006) (citations omitted).

Defamatory words are either actionable *per se* or *per quod*; the former statements

presume damages and include statements that "attribute to someone a criminal

offense, a loathsome disease, serious sexual misconduct, or conduct which is

incompatible with his business, trade, profession, or office[,]" while the latter

require a proof of actual damages. *Id*. at 61 (citations omitted). Statements of

opinion may constitute actionable defamatory communications if they imply

undisclosed defamatory facts as a basis for the opinions. *Yancey v. Hamilton*, 786

S.W.2d 854, 857 (Ky. 1989). To that end, Kentucky law distinguishes between

pure opinion and mixed expressions of opinion:

> Pure opinion, which is absolutely privileged, occurs
> where the commentator states the facts on which the
> opinion is based, or where both parties to the
> communication know or assume the exclusive facts on
> which the comment is clearly based. [*Restatement*
> (*Second*) *of Torts* § 566 (1977)] at comment b. In

contrast, the mixed type "is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication." *Id.*

*Id.* When examining whether the statements are opinions, we construe the statements in the whole context of their publication. *Id.* (citing *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882 (Ky. 1981), *cert. denied*, 456 U.S. 975, 102 S. Ct. 2239, 72 L. Ed. 2d 849 (1982)). We examine the statements to determine whether they are provable as false. *Cromity v. Meiners*, 494 S.W.3d 499, 503 (Ky. App. 2015) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)). "In other words, for a statement to be actionable, the statement must be sufficiently factual so that it may be proven false, or the statement must imply underlying facts which are provable as false." *Id.*

Here, the statements were non-actionable opinions, and the Trial Court properly held that Davenport failed to make a *prima facie* showing that any of these statements was defamatory. Each of the statements, viewed in the whole context, was based upon facts that were known or could readily be assumed by the parties involved in the communications. Mandy Mulflur Masterson and Elizabeth Mulflur made the statements to Carla Judd. The parties explicitly and impliedly understood the statements were opinions based on the experiences they were having with Davenport's claimed, repeated failures to install pools timely.

-28-

Being based on expressed and implied facts, we must determine whether the facts underlying the assertions are provable as false. *Cromity*, 494 S.W.3d at 504. The terms "snarky," "unprofessional," "embarrassing," and "a piece of work," are opinions based on each speaker's impressions of Davenport's actions, not on any provably false facts. They could constitute broadly disparaging statements, but "[d]isparaging statements that 'are not so definite or precise as to be branded false[]' cannot support an action for defamation." *Id.* (quoting *Welch v. Am. Publ'g Co. of Ky*, 3 S.W.3d 724, 730 (Ky. 1999)).

Additionally, the Ponzi scheme statement was not actionable defamatory statement because it was pure opinion. Notably, the complained-of statement says the attorney "thinks" that the Davenports were operating a Ponzi scheme, a statement clearly evincing a pure opinion. Furthermore, in context, the statement showed the attorney had a working theory of the case and was wanting to discuss with others their experiences with the Davenports to support or deny his theory. In other words, the assertion of a Ponzi scheme was a working theory and not even a definitive conclusion – further evidence that it was pure opinion and not actionable defamation.

Continuing, the statement that the Davenports were "try[ing] to steal our money" was not an actionable defamatory statement because it also was pure opinion. The whole statement was, "We're going to entertain getting our pool

shell and equipment, whatever the Davenport thugs can prove they've lost or are out of pocket to try to steal our money." This statement in context shows that Elizabeth Mulflur was discussing her attempt to mitigate her damages and would consider it stealing her money if she could not recover the items that the Davenports purchased with the deposit money. There are no provably false statements in this assertion; the Davenports have asserted that they intended on completing the pool per the contract, and Elizabeth Mulflur has asserted that the Davenports did not intend to complete the pool. Just like in *Meiners*, where the underlying facts are based on one party's word against another party's word, there are no definitive means of proving whether Elizabeth Mulflur's statement is true or false; thus her statement is merely a disparaging statement that "cannot support an action for defamation." 494 S.W.3d at 504 (citation omitted).

Finally, we address the use of the term "thug." While a closer call, Davenport has not presented *prima facie* evidence that this disparaging statement is based on any provably false facts either. Indeed, no Kentucky case has expressly found "thug" to be a defamatory statement. As a sister jurisdiction has noted, "'thug' is a name that does not impute any particular crime to the plaintiff; it is informal, and does not rise to the level of contempt or hatred." *Garrett v. Kneass*, 482 So.2d 876, 879 (La. Ct. App. 1986). *See also Fortson v. Colangelo*, 434 F.

Supp. 2d 1369 (S.D. Fla. 2006) (holding reference to NBA player as a "thug" was hyperbolic).

Here, the term "thug" was used in an exaggerated, non-literal, fashion to emphasize a point already made with no provably false facts underlying it. Elizabeth Mulflur, talking with Carla Judd, used the term while discussing mitigation measures. Elizabeth Mulflur stated that she hoped to get back a pool shell and equipment from the deposit money to avoid Davenport receiving a financial windfall from the failed contract and deposit. Using the term may have been hyperbolic or vulgar, but it was not actionable defamation as it was not based on any provably false facts. The context of the communication is clear – Elizabeth Mulflur was name-calling Davenport because she was upset about the business dealings, but nothing in the statement indicates that she used the term because she believed Davenport would act criminally or with thuggery, *i.e.*, by exacting money from her by physical force or unlawful means.

Additionally, the statement neither appears to have been published to the Joneses nor led to any alleged damages. Importantly, Davenport's claim revolves around what Elizabeth Mulflur allegedly conveyed to the Joneses. The "thug" comment was made to Carla Judd after Carla Judd already indicated to Elizabeth Mulflur that the Joneses had consulted with an attorney and were "unfortunately going to walk away from all the money they'd already put into the

-31-

project."  Because the "thug" statement at worst constitutes defamation *per quod*, Davenport's *prima facie* showing further fails because there was no showing of actual damages.

Accordingly, Davenport failed to make a *prima facie* showing of actionable defamation claims, and the Trial Court properly entered judgment in the Mulflurs' favor.  Hence, we affirm on this issue.

## VI.    Is KRS 454.478 fee provision void for vagueness?

Davenport next argues that UPEPA's fee-shifting provision in KRS 454.478 is void for vagueness.  The statute provides that, upon proper motion, "the court shall award court costs, reasonable attorney's fees, and reasonable litigation expenses related to the motion . . . ."  *Id*.  Davenport argues that this last phrase, "related to the motion[,]" is vague and could be read to apply to the reasonable attorney's fees provision and limit such fees solely to those incurred in relation to the UPEPA motion, or it could be read to only apply to the reasonable litigation expenses and thus permit attorney's fees for the whole representation in the matter. The Trial Court, however, found the fee-shifting provisions to be intelligible:

> Thus, this Court believes the statute is sufficiently clear and indeed is purposely open-ended as to what costs, fees, and expenses can be recouped as ordered by a Court.  The Court should award costs and fees related to the motion, and that may, at times, included expenses, costs, or fess [sic] outside of the actual drafting and arguing of the motion to dismiss itself.  For example, it could well include some discovery as is necessary for the

movant to determine if such a claim can be made and to use to support or mitigate such a claim. The statute allows the Court appropriate leeway in making the determination of what exactly is *related to the motion*. Therefore, the Motion to Declare KRS 454.478 unconstitutional is DENIED.

Order at 2-3 (emphasis in original).

Upon our *de novo* review of this pure question of law, we hold that the void-for-vagueness doctrine is not implicated by KRS 454.478, and the statute is constitutional. Void-for-vagueness claims typically arise in free speech and criminal contexts that necessarily invoke more rigorous review; in other circumstances of non-punitive, civil review, the terminology changes significantly from "vagueness" to "unintelligibility":

> The void-for-vagueness doctrine is most often applied in the context of the First Amendment, the criminal law, and punitive civil laws. *See, e.g.*[,] *Martin v. Commonwealth*, Ky., 96 S.W.3d 38, 59-60 (2003) (First Amendment); *Jones v. Commonwealth*, Ky., 830 S.W.2d 877, 880 (1992) (criminal law); *Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 499-500, 102 S. Ct. 1186, 1193-94, 71 L. Ed. 2d 362 (1982) (civil penalties). However, while statutes affecting those areas should receive the most *rigorous* review and are most *commonly* held void for vagueness, non-punitive civil, regulatory, or spending statutes are also invalid if they are so unintelligible as to be incapable of judicial interpretation. In that circumstance, the statute often is declared void for "unintelligibility" or "uncertainty" as opposed to "vagueness."

*Board of Trustees of Judicial Form Retirement System v. Attorney General of Commonwealth*, 132 S.W.3d 770, 778 (Ky. 2003) (emphasis in original). Accordingly, void-for-vagueness challenges are bedrocked in the First Amendment for speech-based laws and the Due Process Clause of the Fifth and Fourteenth Amendments for criminal laws. *Utility Management Group, LLC v. Pike County Fiscal Court*, 531 S.W.3d 3, 12 (Ky. 2017). A void-for-unintelligibility claim, though, stands on the separation-of-powers doctrine, to wit, "[w]here a statute is unintelligible, the courts cannot interpret it but instead must speculate about the legislative intent: such judicial speculation is effectively unauthorized judicial legislation." *Id*. at 13 (citing *Bd. of Trustees*, 132 S.W.3d at 781). "The question posed is whether the people the statute affects can understand it and the courts can deduce the legislature's will." *Id.* (citing *Folks v. Barren Cty*., 313 Ky. 515, 232 S.W.2d 1010, 1013 (1950)).

Accordingly, our review in this case is for unintelligibility, and the question is whether courts can deduce the legislature's will in the fee-shifting statute. The Court finds in the affirmative. UPEPA's fee-shifting statute is sufficiently intelligible that any court can deduce the legislature's will.

Initially, we note that this area of law – fee-shifting statutes – is one where Trial Courts are already vested with broad discretion to fashion a remedy when the General Assembly grants them such statutory authority. *See Progressive*

*Direct Insurance Company v. Hartson*, 661 S.W.3d 291, 304 (Ky. App. 2023).

Indeed, on appeal, Trial Courts' decisions regarding attorney's fees are reviewed only for abuse of discretion. *Id.* (citing *Miller v. McGinty*, 234 S.W.3d 371, 373 (Ky. App. 2007)).

Here, the discretion available is for a Trial Court to shift fees at a very early stage of the proceedings when a party has been targeted for exercising its protected speech. The fee-shifting provision clearly exists to make whole a party who – invoking UPEPA's procedural mechanisms – incurred court costs, attorney's fees, and litigation expenses. We are confident that the Courts in this Commonwealth are able to examine a fee-shifting request in these circumstances and fashion a remedy that addresses those court costs, attorney's fees, and litigation expenses that are related to the motion invoking UPEPA's procedures. Regardless, the statute is at least intelligible enough for Trial Courts to examine the fee-shifting request and determine what court costs, attorney's fees, and litigation expenses are related to the UPEPA motion, an examination that is inherently fact-specific and will require a Trial Court to exercise its discretion and fashion a remedy that fits within one of many potential remedies. Accordingly, the statute is not void-for-unintelligibility or uncertainty. We affirm the Trial Court on this issue.

**VII. Should the Trial Court have awarded attorney's fees for time not associated with the motion to dismiss?**

Davenport next argues that the Trial Court abused its discretion by awarding attorney's fees incurred for the entire representation, not only for the fees related to the UPEPA motion to dismiss. We find no such error.

First, the issue has likely been waived. As the Trial Court noted, at the hearing "the Court asked if any party wished to address the individual amounts claimed. [Davenport] was given an opportunity to state which items they believed were not 'related to the motion,' and [Davenport] declined to do so." Order at 3.

Second, we hold that the Trial Court did not abuse its discretion here. The Trial Court granted attorney's fees for the entire representation to "reimburse a person who is covered under UPEPA for any amount they must pay out in order to seek and obtain a judicial determination that the claim against them must be dismissed." *Id*. Given the facts in the instant case, this application of the UPEPA's fee-shifting provision is within the realm of possible decisions. Accordingly, the Trial Court did not abuse its discretion in its award of attorney's fees.[6]

---

[6] Mulflurs request that we remand the case to the Trial Court so they may seek additional fees incurred during the instant, appellate litigation. We decline such invitation. To do so would potentially create an unending litigation loop, as either of the parties may then appeal again. We do not believe a perpetual litigation loop is the intent of KRS 454.478(1). More importantly, though, this appeal is Davenport's, not Mulflurs,' and we find no error in the issue raised by Davenport. Thus, we have cause only to affirm, not remand, the Trial Court's order. Nothing

-36-

## VIII. Should the Trial Court have converted the attorney's fees award to a civil judgment?

Finally, Davenport alleges that the Trial Court lacked jurisdiction to convert the attorney's fee award to a civil judgment. No notice of appeal was filed regarding the order converting the fee to a civil judgment, and we lack jurisdiction to rule on it. A brief history is necessary.

On March 9, 2023, the Trial Court entered its "final and appealable" order awarding attorney's fees. Davenport timely appealed that order to this Court. On March 23, 2023, Mulflurs filed a motion to have the attorney's fees order deemed a common law judgment bearing interest at the legal rate. Davenport filed a response opposing the motion, noting that the Trial Court had no jurisdiction because the motion was filed more than ten days after the order was entered and because Davenport had already filed a notice of appeal. The Mulflurs filed a reply that facially agreed with the jurisdictional claims, but claimed the Trial Court had jurisdiction to perform a ministerial task that would permit the Mulflurs to collect on their judgment.

On April 17, 2023, the Trial Court then issued an "Order/Judgment" summarily converting the award to a common law judgment "bearing interest at

---

about our ruling here should preclude Mulflurs from seeking additional fees incurred during the appeal, should they decide to pursue same before the Trial Court.

the legal rate of six percent (6%) per annum from the date of entry until paid."[7]

There is no notice of appeal of this "Order/Judgment" in the certified record.

Notably, Davenport fails to include a preservation statement regarding this issue. Our review of the record discloses no notice of appeal pertaining to the April 17, 2023, "Order/Judgment." Normally we would be forced to dismiss the appeal, as timely filing of a notice of appeal is jurisdictional, and the "failure of a party to file timely a notice of appeal . . . shall result in a dismissal[.]" RAP 2(A)(2)-(3). However, the instant appeal is pursuant to a proper and timely-filed notice of appeal as to all other claims, the dismissal of which would be improper. Instead, as we lack jurisdiction to rule on an order from which there was no notice of appeal, we decline to address this singular issue.

## CONCLUSION

For the reasons announced above, Kentucky's UPEPA is a procedural or remedial change that does not alter, abolish, or impair any common-law right of recovery; hence, it applies retroactively and does not violate jural rights. Using

---

[7] Davenport claims that the Trial Court, *sua sponte*, issued a second order on "May 16, 2022" [sic] that purportedly converted its order to a civil judgment in favor of the Judds. Davenport expressly notes that this purported order is not included in the certified record but is included in its Appellant's Brief's appendix. Such inclusion in the appendix violates our appellate rules. RAP 32(E)(1)(c) ("Items not included in the record. Except for matters of which the appellate court may take judicial notice, materials and documents not included in the record shall not be introduced or used as exhibits in support of briefs."). None of the Appellees take any issue with this violation, and while we warn counsel for Davenport to comply with our RAP in future filings, we do not elect to impose sanctions for this violation at this time.

these procedural mechanisms, the Trial Court properly dismissed the case and

granted attorney's fees to the defendants. Accordingly, we AFFIRM.

**IT IS FURTHER ORDERED** that the Mulflurs' motion to cite

supplemental authority/take judicial notice of a related judicial decision is

**DENIED AS MOOT**.

ALL CONCUR.

ENTERED: _June 14, 2024_____    _____

JUDGE, COURT OF APPEALS

BRIEFS AND ORAL ARGUMENT
FOR APPELLANTS:

Kenneth J. Henry
Louisville, Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEES:

Stephen B. Pence
Louisville, Kentucky

BRIEF FOR THE ATTORNEY
GENERAL:

Russell Coleman
Attorney General of Kentucky

Matthew F. Kuhn
Elizabeth Hedges
Assistant Attorneys General
Frankfort, Kentucky

ORAL ARGUMENT FOR THE
ATTORNEY GENERAL:

Elizabeth Hedges
Frankfort, Kentucky