# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RAUL ARMENTA JR. and SHANNON ARMENTA, individually and on behalf of their minor son, H.A., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No.: N24C-02-051 SPL |
| G/O MEDIA INC., D/B/A DEADSPIN, | ) ) ) | |
| Defendant. | ) ) | |

Submitted: July 8, 2024
Decided: October 7, 2024

## MEMORANDUM OPINION

*On Defendant's, G/O Media, Inc., D/B/A Deadspin,*
*Motion to Dismiss:*
### DENIED

Elizabeth M. Locke, Esq. (Argued), David Sillers, Esq., Jonathan R. Kaiman, Esq. of CLARE LOCKE LLP, Brian E. Farnan, Esq., Michael J. Farnan Esq. of FARNAN LLP, *Attorneys for Plaintiffs*, *Raul Armenta Jr., Shannon Armenta, and H.A.*

Joseph Slaughter, Esq. (Argued), Elizabeth S. Fenton, Esq., Lynn Oberlander, Esq., Lauren P. Russell, Esq., of BALLARD SPAHR LLP, *Attorneys for Defendant G/O Media d/b/a Deadspin.*

**LUGG, J.**

**INTRODUCTION**

Deadspin published an image of a child displaying his passionate fandom as a backdrop for its critique of the NFL's diversity efforts and, in its description of the child, crossed the fine line protecting its speech from defamation claims. On November 26, 2023, the Armenta family, a mother, father, and their minor son, traveled from California to Las Vegas, Nevada to attend an NFL game between the Las Vegas Raiders and the Kansas City Chiefs. To support his favorite team, H.A., the Armentas' minor son, wore Native American headdress, painted his face black and red, and donned a Chiefs jersey. During the game, a television broadcast focused briefly on H.A. Soon afterwards, still images, or "screenshots," of the television broadcast circulated online. The following day, Deadspin published an article, with an accompanying screenshot, describing the boy as wearing "Black face" in a display of racial animus toward African Americans and "Native headdress" to display his hatred toward the Native American. The article further surmised that Raul and Shannon Armenta, H.A.'s parents, taught H.A. that hatred.

The Armentas sued Deadspin for defamation, asserting that Deadspin's reporting caused them serious reputational and emotional harm. Deadspin has moved to dismiss under Delaware Superior Court Civil Rule 12(b)(6), contending that the article contained an expression of opinion and is therefore insulated from the Armentas' defamation claims. Having reviewed the complaint, the Court

1

concludes that Deadspin's statements accusing H.A. of wearing Black face and Native headdress to "hate Black people and the Native American at the same time," and that he was taught this hatred by his parents, are provably false assertions of fact and are therefore actionable and Deadspin's motion is **DENIED.** Further, Deadspin's motion to dismiss based on *forum non conveniens* favoring California is **DENIED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. The Conduct, the Article, and Its Updates**

Raul and Shannon Armenta and their nine-year-old son, H.A., are residents of California.[1]  On November 26, 2023, Raul, Shannon, and H.A. attended an NFL game in Las Vegas, Nevada.[2]  H.A., a Kansas City Chiefs fan, wore a Chiefs jersey, Native American headdress, and painted his face half red and half black.[3]  Raul helped him paint his face.[4]  H.A. appeared on the CBS television broadcast for approximately three seconds.[5]  A still photo, or "screenshot," of H.A. soon began circulating on social media.[6]  The screenshot showed H.A. at an angle displaying only the half of his face painted black.[7]

Defendant G/O Media, d/b/a Deadspin, is a media company headquartered in New York and incorporated in Delaware.[8]  The day after the football game, Deadspin published an article (the "Original Article"), written by non-party Senior Writer

---

[1] Compl. ¶¶ 14-16.

[2] Compl. ¶ 1.

[3] Compl. ¶¶ 1-2.

[4] Compl. ¶ 19.

[5] Compl. ¶ 23.

[6] Docket Item ("D.I.") 18 ("Slaughter Decl."), Ex. 5.

[7] Slaughter Decl., Ex. 5.

[8] Compl. ¶ 17.  One month after the Armentas' filed their complaint, G/O Media sold the Deadspin website.  D.I. 18 ("Javaid Decl.").  For purposes of this litigation, "Deadspin" refers to G/O Media.

Carron Phillips,[9] criticizing the Armentas, the NFL and its commissioner, and the league's social justice initiatives.[10] The Original Article's headline read: "The NFL needs to speak out against the Kansas City Chiefs fan in Black face, Native headdress: They're doubling up on the racism. Are you going to say anything, Roger Goodell?"[11] The screenshot of H.A., showing only the black half of his face, appeared directly below the headline.[12] Beneath the screenshot, the article opened, "[i]t takes a lot to disrespect two groups of people at once. But on Sunday afternoon in Las Vegas, a Kansas City Chiefs fan found a way to hate Black people and the Native American at the same time."[13] And, the article rhetorically inquired, "[d]espite their age, who taught that person that what they were wearing was appropriate?"[14]

Deadspin posted a link to the Original Article on the social media platform X.[15] X's content moderation program "Community Notes" appended a statement

[9] Compl. ¶ 18.

[10] D.I. 39, Joint Stipulation Regarding Article Versions ("Joint Stipulation"), Ex. 1.

[11] Compl. ¶¶ 3-4; Slaughter Decl. ¶ 4; Javaid Decl. ¶ 4.

[12] Joint Stipulation, Ex. 1.

[13] Joint Stipulation, Ex. 1.

[14] Joint Stipulation, Ex. 1.

[15] Compl. ¶ 35.

clarifying that H.A. was not wearing Black face because the other side of his face was painted red.[16]

The Armentas contend that their reputations were damaged by Deadspin's publication.[17] After Deadspin posted the Original Article, the Armentas began receiving hateful messages and death threats.[18] They requested that Deadspin remove the Original Article from its website.[19] Deadspin instead republished an edited version of the Original Article on November 30, 2023 (the "November 30 Update").[20] The November 30 Update retained accusations of H.A.'s Black face, hatred for Black people and the Native American, and continued to display his picture.[21] On December 7, 2023, Deadspin again updated the article (the "December 7 Update").[22] The December 7 Update removed H.A.'s picture and changed the headline to read "Culturally Insensitive Face Paint" instead of "Black face," but maintained that H.A. wore "what appeared to be black face paint."[23]

---

[16] Compl. ¶ 35.

[17] Compl. ¶¶ 52-53, 75, 85, 102, 111, 127.

[18] Compl. ¶ 49-50.

[19] Compl. ¶¶ 36.

[20] Compl. ¶¶ 40-48.

[21] Joint Stipulation, Ex. 2.

[22] Joint Stipulation, Ex. 3.

[23] Joint Stipulation, Ex. 3.

The Armentas allege that neither the November 30 Update nor the December 7 Update stopped the hateful and threatening messages.[24] The Armentas contend that Deadspin's publications directly led to the family's fear for their safety and H.A.'s declined academic performance.[25] On December 12, 2023, Deadspin updated the article a final time.[26] No claim arises from the final update.

**B. The Armentas Bring Suit for Defamation**

On February 6, 2024, the Armentas filed a complaint alleging five counts of defamation against Deadspin based on the Original Article, the November 30 Update, and the December 7 Update.[27] The complaint avers that "Phillips' accusation that H.A. engaged in racist conduct towards Black people and Native Americans—and that Shannon and Raul taught him to engage in that conduct—is false and defamatory."[28]

Count I asserts defamation *per se* based on Deadspin's publication of the Original Article.[29] The Armentas contend that the Original Article created "three distinct defamatory messages": (1) H.A. wore Black face, "a public display of vile

---

[24] Compl. ¶¶ 49-58.

[25] Compl. ¶¶ 49-58.

[26] Joint Stipulation, Ex. 4.

[27] *See* Compl.

[28] Compl. ¶ 33.

[29] Compl. ¶ 60.

racist conduct toward Black people;" (2) H.A. wore a Native American headdress to demonstrate his hatred for Native Americans; and (3) H.A.'s parents, Raul and Shannon Armenta, taught H.A. to hate Black people and Native Americans.[30] Count I asserts that the following statements are false, defamatory, and constitute defamation *per se*:

a) A photo that Deadspin selectively and misleadingly edited to make H.A. appear as if he was wearing blackface, and its caption alleging that he was the "Chiefs fan on Sunday in . . . Black face."

b) The title of the Article, "The NFL needs to speak out against the Kansas City Chiefs fan in Black face, Native headdress."

c) "[O]n Sunday afternoon in Las Vegas, a Kansas City Chiefs fan [H.A.] found a way to hate Black people and the Native Americans at the same time."

d) H.A. and his family are "doubling up on the racism."

e) "The image of a Chiefs fan in Black face … leads to so many unanswered questions."

f) H.A.'s costume "was as if Jon Gruden's emails had come to life."

g) "This [H.A.] is what happens when you ban books, stand against Critical Race Theory, and try to erase centuries of hate. You give future generations [H.A.] the ammunition they need to evolve and recreate racism better than before."

h) "The image of a Chiefs fan in Black face wearing a Native headdress during a road game leads to so many unanswered questions. … The answers to all of those questions lead back to the NFL. … While it isn't the league's responsibility to stop racism and

---

[30] Compl. ¶ 63.

hate from being taught in the home, they are a league that has relentlessly participated in prejudice."[31]

Count II asserts defamation by implication and is also based on the Original Article.[32] Count II asserts that the following imply false and defamatory facts about the Armenta family:

a) A photo that Deadspin selectively and misleadingly edited to make H.A. appear as if he was wearing Black face.

b) "The image of a Chiefs fan in Black face wearing a Native headdress during a road game leads to so many unanswered questions."

c) "The answers to all of those questions lead back to the NFL. … While it isn't the league's responsibility to stop racism and hate from being taught in the home, they are a league that has relentlessly participated in prejudice."[33]

Count III asserts defamation *per se* and is substantively identical to Count I, but based on the November 30 Update.[34] Count IV, also stemming from the November 30 Update, alleges defamation by implication and offers statements similar to those in Counts I, II, and III.[35]

---

[31] Compl. ¶ 61(a-h) (emphasis excluded).

[32] Compl. ¶ 77.

[33] Compl. ¶ 79(a-c).

[34] Compl. ¶¶ 86-102.

[35] Compl. ¶¶ 103-111.

8

Count V alleges defamation *per se* based on the December 7 Update.[36] It

avers that the following statements convey the same "distinct defamatory messages"

as asserted in Counts I, II, III, and IV:

a) "It takes a lot to disrespect two groups of people at once. But on Sunday afternoon in Las Vegas, someone in the stands at the Kansas City Chiefs game found a way, leading to lots of unanswered questions."

b) "The answers to those questions lead back to the NFL. While it isn't the league's responsibility to stop racism, they are a league that has relentlessly participated in prejudice."

c) "This is what happens when you ban books, stand against Critical Race Theory, and try to erase centuries of hate. You give future generations the ammunition they need to evolve and recreate racism better than before."

d) "As of now, the league hasn't released a statement on what took place in the stands in Las Vegas on Sunday."[37]

---

[36] Compl. ¶ 113.

[37] Compl. ¶ 114 (a-d).

9

## STANDARD OF REVIEW

### I. DELAWARE SUPERIOR COURT CIVIL RULE 12(b)(6)

Delaware Superior Court Civil Rule 12(b)(6) governs a motion to dismiss for failure to state a claim upon which relief can be granted.[38]  When assessing a motion to dismiss under this rule, this Court must:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) do not affirm a dismissal unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[39]

This Court, in *U.S. Dominion v. Fox*, explained that even where the applicable substantive state law contains an Anti-SLAPP statute, Delaware's conceivability standard of review applies to a motion to dismiss.[40]  Delaware's pleading standards at the motion to dismiss stage are minimal.[41]  A complaint is sufficient to survive a motion to dismiss under Rule 12(b)(6) "[if] a plaintiff may recover under any reasonably conceivable set of circumstances susceptible to proof under the complaint."[42]  If, based on the circumstances presented, the plaintiff may recover,

---

[38] Super. Ct. Civ. R. 12(b)(6).

[39] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[40] 2021 WL 5984265 at *18-19 (Del. Super. Ct. Dec. 16, 2021).

[41] *Cent. Mortg. Co.*, 27 A.3d at 536.

[42] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

then the motion to dismiss must be denied.[43]  Conversely, a motion to dismiss will be granted if "under no reasonable interpretation of the facts alleged could the complaint state a complaint for which relief might be granted."[44]  The Court need not "accept conclusory allegations unsupported by specific facts or [] draw unreasonable inferences in the plaintiff's favor."[45]

There exist additional considerations unique to defamation suits when evaluating a motion to dismiss.  "Early dismissal of defamation lawsuits for failure of the complaint to state a claim on which relief can be granted not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive."[46]  Accordingly, courts set a "high bar to clear to establish defamation," especially for claims made by a public figure against the free press.[47]

---

[43] *Id.*

[44] *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. Ct. 2021).

[45] *Clinton v. Enterprise Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

[46] *ShotSpotter Inc. v. VICE Media, LLC*, 2022 WL 2373418, *6 (Del. Super. Ct. Jun. 30, 2022) (cleaned up).

[47] *Id.* at *6-8.

## II.   DELAWARE SUPERIOR COURT CIVIL RULE 12(b)(3)

Delaware Superior Court Civil Rule 12(b)(3) governs a motion to dismiss based on *forum non conveniens*.[48]  The doctrine of *forum non conveniens* empowers this Court to "decline to hear a case despite having jurisdiction over the subject matter and the parties."[49]  Delaware Courts are hesitant to grant relief "based on *forum non conveniens*, and the doctrine is not a vehicle by which the Court should determine which forum would be most convenient for the parties."[50]  "*Forum non conveniens* claims motions are addressed to the trial court's discretion."[51]

---

[48] *Arrowood Indem. Co. v. AmerisourceBergen Corp.*, 2023 WL 2726924, at *7 (Del. Super. Ct. Mar. 30, 2023).

[49] *Chrysler First Business Credit Corp. v. 1500 Locust Ltd. Partnership*, 669 A.2d 104, 106 (Del. 1995).

[50] *In re Citigroup, Inc. S'holder Derivative Litig.*, 964 A.2d 106, 117 (Del. Ch. 2009) (citing *Taylor v. LSI Logic Corp.*, 659 A.2d 1196, 1199 (Del. 1997)).

[51] *GXP Cap., LLC v. Argonaut Mfg. Servs., Inc.*, 253 A.3d 93, 97 (Del. 2021).

## ANALYSIS

## I. THE ARMENTAS' DEFAMATION CLAIMS ARE ACTIONABLE.

### A. California Law Applies to the Armentas' Substantive Claims.

This Court follows the Restatement (Second) of Conflict of Laws, which directs that the law of the jurisdiction with the "most significant relationship" to the case governs.[52] The Restatement further specifies that "the state of the most significant relationship will usually be the state where the [plaintiff] was domiciled at the time, if the matter complained of was published in that state."[53] In an internet defamation case, the law of plaintiffs' home state usually applies because "defamation produces a special kind of injury that has its principal effect among one's friends, acquaintances, neighbors and business associates in the place of one's residence."[54] In *Schmidt v. Washington Newspaper Publishing Company*, the plaintiff was a resident of California, and no other state held a "more significant relationship" to the case; therefore, that court applied California substantive law.[55]

---

[52] *Smith v. Delaware State Univ.*, 47 A.3d 472, 480 (Del. 2012).

[53] Restatement (Second) of Conflict of Laws § 150 (Am. Law Inst. 1971).

[54] *Stephen G. Perlman, Rearden LLC v. Vox Media, Inc.*, 2015 WL 5724838, at *11 (Del. Ch. Sept. 30, 2015) (quoting *Aoki v. Benihana, Inc.*, 839 F. Supp. 2d 759, 765 (D. Del. 2012).

[55] *Schmidt v. Washington Newspaper Publ'g Co.*, 2019 WL 4785560, at *2 (Del. Super. Ct. Sept. 30, 2019)

Here, the parties do not identify another jurisdiction with any significant relationship to this case; in fact, they appear to agree that California substantive law controls. In any event, the Court will apply California substantive law because that is the plaintiffs' home state. Also, to the extent First Amendment protections are asserted, the Court will apply precedent assessing Constitutional protections applicable to defamation claims.[56]

## B. The Contours of Defamation Under California Law

Under California law, defamation "involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage."[57] "The defamatory statement must also specifically refer to, or be 'of and concerning,' the plaintiff."[58] As explained in *McGarry v. University of San Diego*, a valid defamation claim must be supported by statements containing a "provable falsehood," and while generally protected, "expressions of opinion may imply an assertion of objective fact" and thus may be actionable.[59]

---

[56] *See Page v. Oath*, 2021 WL 528472, at *3 (Del. Super. Ct. Feb. 11, 2021) (finding a choice of law determination between New York and Delaware unnecessary for defamation claims).

[57] *Taus v. Loftus*, 151 P.3d 1185, 1209 (Cal. 2007).

[58] *John Doe 2 v. Superior Court*, 206 Cal.Rptr.3d 60, 68 (Cal. Ct. App. 2016).

[59] 64 Cal.Rptr.3d 467, 479 (Cal. Ct. App. 2007).

Here, Deadspin argues that its statements cannot be proven false because they are statements of opinion.[60] Whether a statement constitutes a statement of fact or opinion is a question of law.[61] Statements expressed as opinions, though, do not "enjoy blanket constitutional protection" because "expressions of 'opinion' may often imply an assertion of objective fact."[62] As such, this Court must determine whether the statements expressed in Deadspin's Article and its subsequent Updates are actionable: "whether a reasonable fact finder could conclude that the published statement declares or implies a provably false assertion of fact."[63]

To answer this question, California Courts have developed a "totality of the circumstances test," under which the language and context of the statement are to be examined.[64] For the statement to be defamatory, it must be "understood in a defamatory sense."[65] Where the indicia of an opinion piece are present, "readers can be expected to discount the statements made in that context as more likely to be the stuff of opinion than fact."[66] Courts must consider "the nature and full content of

---

[60] Op. Br. 15-20.

[61] *Franklin v. Dynamic Details*, 10 Cal.Rptr.3d 429, 436 (Cal. Ct. App. 2004).

[62] *Id.* (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)).

[63] *Id.*

[64] *Baker v. Los Angeles Herald Examiner*, 721 P.2d 87, 90-91 (Cal. 1986).

[65] *Id.* at 90.

[66] *Morningstar v. Superior Court*, 29 Cal.Rptr.2d 547, 556 (Cal. Ct. App. 1994)

15

the communication and the knowledge and understanding of the audience to whom the publication was directed."[67]

## C. The Contours of Defamation under the United States Constitution

"The Free Speech Clause of the First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech.'"[68] But, Congress and the States may impose liability for defamatory speech "subject to a number of constitutional guardrails."[69] To be actionable, a statement must "be understood as defamatory by a reasonable third party and was published."[70] "[W]hen the challenged statement is on a matter of public concern, the plaintiff must demonstrate that the statement was false."[71] Statements of opinion on matters of public concern "are not categorically shielded from actionability."[72] Rather, to be actionable, defamatory statements of opinion must "reasonably be interpreted as stating or implying defamatory facts about an individual that are provably false."[73]

---

[67] *Baker*, 721 P.2d at 91.

[68] *Cousins v. Goodier*, 283 A.3d 1140, 1148 (Del. 2022) (quoting U.S. Const. amend I) (cleaned up).

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

The fact that the use or display of cultural "mascots and symbols is controversial and has been for decades is scarcely subject to doubt."[74] Commentary relating to political, social, and other community concerns are fairly considered addressing matters or public concern warranting greater Constitutional scrutiny.[75] The Delaware Supreme Court has concluded that "statements on matters of public concern are actionable in defamation when, even if presented as 'opinion,' they may be reasonably construed as stating or implying defamatory facts about an individual that are provably false."[76]

**D. Statements Accusing H.A. of Wearing Black face are Actionable.**

Generally, statements labeling a person as racist are not actionable.[77] "A term like racist, while exceptionally negative, insulting, and highly charged—is not actionable under defamation-type claims because it is a word that lacks precise meaning and can imply many different kinds of fact."[78] In *Cousins*, the Delaware

---

[74] *Id.* at 1151 (citing reports of controversies surrounding Native American mascots, monikers, and imagery).

[75] *Id.*

[76] *Id.* at 1155.

[77] *See generally, id.*

[78] *Skidmore v. Gilbert*, 2022 WL 464177, at *9 (N.D. Cal. Feb. 15, 2022) (cleaned up) (citing *Overhill Farms, Inc. v. Lopez*, 119 Cal.Rptr.3d 127, 138-39 (Cal. Ct. App. 2010)).

17

Supreme Court explained that the defendant's "personal view of what is racist" was not provably false and upheld the trial court's dismissal of the defamation claim:

> It cannot be denied America is in the midst of an ongoing national debate about what it means to be racist. To be sure, there is nearly universal agreement that some behaviors are racist: these include the use of racial slurs, the practicing of overt racial discrimination, and the commission of racially motivated violence. . . . But when a wider net is cast, this consensus quickly vanishes: it is clear to us that Americans disagree about a long and growing list of things that to some are racist and to others are not. It is not our role here to enter into this debate and decide who is right and who is wrong. In fact, we think that the First Amendment is clear that doing so would be the opposite of our role.[79]

Deadspin argues that the statements alleging H.A. wore Black face[80] are non-actionable for the same reasons that calling him racist would be non-actionable.[81] The Armentas recognize that courts "often dismiss as non-actionable 'pure opinion' statements … that someone 'is a racist' … without more."[82]  But there is a legally significant distinction between a statement calling someone a racist and a statement accusing someone of engaging in racist conduct; expressions of opinion are not

---

[79] *Cousins*, 283 A.3d at 1157-58.

[80] "Blackface is used to mock or ridicule Black people; it is considered deeply offensive." *Spectrum WT v. Wendler*, 693 F.Supp.3d 689, 696 n.1 (N.D. Tex. 2023) (quoting *Smith v. Salvation Army,* 2023 WL 2252380, at \*6 (N.D. Ala. Feb. 27, 2023)) (cleaned up).  Deadspin, in recasting Black face as "culturally insensitive face paint" in the December 7 Update, recognizes the negative understanding of the descriptive term.

[81] Op. Br. 15-20.

[82] Resp. Br. 10.

protected if they imply an assertion of an objective, defamatory fact.[83]  Two recent

decisions applying California law, *Overhill Farms, Inc. v. Lopez*[84] and *La Liberte v.*

*Reid*,[85] assist in clarifying this distinction.

The Court in *Overhill Farms* held that "a claim of racially motivated

employment termination is a provably false fact."[86]  In that case, a group of

employees accused their employer of engaging in racist firings of Hispanic workers

as a pretext to hide racist and discriminatory abuse against Latina women

immigrants.[87]  After the employer sued for defamation, the employees moved to

dismiss, arguing that their statements were non-actionable opinions.[88]  The

California Court of Appeals denied the employees' motion, reasoning:

> [D]efendants did not merely accuse [their employer] of being "racist"
> in some abstract sense …. [I]n almost every instance, defendants'
> characterization of [their employer] as "racist" is supported by a
> specific reference to its decision to terminate the employment of a large
> group of Latino immigrant workers.  The assertion of racism, when
> viewed in that specific factual context, is not merely a hyperbolic
> characterization of [the employer's] black corporate heart—it
> represents an accusation of concrete, wrongful conduct.[89]

---

[83] *Milkovich*, 497 U.S. at 18-19.

[84] 119 Cal.Rptr.3d 127 (Cal. Ct. App. 2010).
[85] 966 F.3d 79 (2d Cir. 2020).

[86] *Overhill Farms, Inc.,* 119 Cal.Rptr.3d at 140-41.

[87] *Id.* at 140.

[88] *Id.* at 132.

[89] *Id.* at 140.

19

The Court continued:

> Defendants' primary contention on appeal is that none of their alleged statements were actionable as defamation because none declared or implied a provably false assertion of fact under the totality of the circumstances. However, the statements reflected in defendants' written press release, leaflets and flyers accused Overhill of more than harboring racist attitudes; they accused Overhill of engaging in a mass employment termination based upon racist and ageist motivations. Such a contention is clearly a "provable fact;" indeed an employer's motivation for terminating employment is a fact plaintiffs attempt to prove routinely in wrongful termination cases.[90]

In *La Liberte v. Reid*, a community activist brought suit after a television host republished two photographs of her at a pro-immigration rally with captions alleging racist conduct.[91] The first caption accused the plaintiff of screaming "You are going to be first deported … dirty Mexican!" at a 14-year-old boy.[92] The second caption compared a photograph of the plaintiff to white Americans yelling at the Little Rock Nine.[93] The television host moved to dismiss the activist's defamation claims, arguing that her statements were "nonactionable statements of opinion."[94] The trial

---

[90] *Overhill Farms, Inc. v. Lopez*, 119 Cal.Rptr.3d 127, 140-41 (Cal. Ct. App. 2010) (citing *Milkovich*, 497 U.S. at 19).

[91] *La Liberte*, 966 F.3d at 84.

[92] *Id.*

[93] *Id.*

[94] *Id.* at 92.

court agreed and granted dismissal.[95]  The Second Circuit Court of Appeals reversed, explaining:

> A reader could interpret the juxtaposition of the Photograph with the 1957 Little Rock image to mean that [plaintiff] likewise screamed at a child out of racial animus—particularly in light of [defendant's] comment that "[h]istory sometimes repeats."  That interpretation is bolstered by [defendant's] description of the white woman in the Little Rock photograph as a "person screaming at a child, with [her] face twisted in rage" and [her] comment that it was "inevitable" that the photos would be juxtaposed.  [Defendant] thus portrayed [plaintiff] as a latter-day counterpart of the white woman in 1957 who verbally assaulted a minority child.  Like the defendants in *Overhill Farms*, [defendant] "did not merely accuse [plaintiff] of being 'racist' in some abstract sense."  Rather, her July 1 Post could be understood as an "accusation of concrete, wrongful conduct," which can be proved to be either true or false. That makes it potentially defamatory.[96]

The Armentas contend that the Original Article and its Updates involve defamatory statements regarding conduct that is provably false and, therefore, this Court should be guided by *Overhill Farms* and *La Liberte*.[97]  These statements include:

(1) H.A. was wearing "Black face;"

(2) H.A.'s conduct in wearing "Black face" was motivated by his hatred of Black people;

(3) H.A.'s wearing of a Native headdress resulted from his hatred of Native Americans;

---

[95] *Id.*

[96] *Id.* at 93 (internal citations omitted).

[97] Resp. Br. 2; *see* Compl.

21

(4) H.A. is part of a "future generation[]" of racists who had "recreate[d] racism better than before"; and

(5) Raul and Shannon Armenta "taught" their son, H.A., "racism and hate" in their home.[98]

Deadspin's audience could understand its portrayal of H.A. to mean that his entire face was painted black and, because his entire face was painted black, it was H.A.'s intent to disrespect and hate African Americans. The publication went beyond an expression of opinion and flatly stated H.A.'s motivation for appearing as he did. Similarly, a reader could be left with the belief that H.A. wore a Native American headdress as a signal of disrespect to that population. Any doubt as to the thrust of these representations is resolved in the opening line of the article, where the author unequivocally asserts, "It takes a lot to disrespect two groups of people at once. But on Sunday afternoon in Las Vegas, a Kansas City Chiefs fan found a way to hate Black people and the Native American at the same time."[99] While arguably couched as opinion, the author devotes substantial time to describing H.A. and attributing negative racial motivation to him. Further, the article may be reasonably viewed as derogating those who may have taught him—his parents. A reader might not, as Deadspin contends, interpret this assertion as a reflection of the author's

---

[98] Resp. Br. 15.

[99] Joint Stipulation, Ex.1 and Ex. 2.

22

opinion.[100] To say one is a racist may be considered opinion, but to plainly state that one's attire, presentation, or upbringing demonstrates their learned hatred for identifiable groups is actionable. A reader may reasonably interpret the Article's assertion that H.A. was wearing Black face as fact.[101]

California's totality of the circumstances test centers on the statement's "susceptibility of being proved true or false."[102] The CBS broadcast showed H.A. for approximately three seconds.[103] In those three seconds, viewers could see that H.A.'s face was painted two colors: black and red.[104] Deadspin published an image of H.A. that displayed only the portion of H.A.'s face painted black and presented it as a factual assertion that there was a "Chiefs fan in Black face" at the game.[105] The complaint asserts facts that, reasonably interpreted, establish Deadspin's Original Article and its Updates as provably false assertions of fact.[106]

Deadspin contends that *La Liberte* and *Overhill Farms* stand as outliers from decisions recognizing that accusations of racist behavior are "inherently subjective

---

[100] Op. Br. 18.

[101] Comp. ¶ 49-50.

[102] *Morningstar v. Superior Court*, 29 Cal.Rptr.2d 547, 557 (Cal. Ct. App. 1994).

[103] Compl. ¶ 2.

[104] Compl. ¶ 2.

[105] Joint Stipulation, Ex.1 and Ex. 2.

[106] Compl. ¶ 2.

and therefore non-actionable[.]"[107] Not so. They reflect reasoned assessments of the lines between protected and actionable speech and offer a paradigm for identifying and assessing provably false allegations of racial animus. This Court may grant Deadspin's motion under Rule 12(b)(6) only if "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[108] Applying the analytical framework of *La Liberte* and *Overhill Farms* to the facts here, the Armentas maintain a "possibility of recovery."[109]

Deadspin further argues that the December 7 Update cannot be considered defamatory because it does not contain an image of H.A., name the Armenta family, or reference "Black face."[110] With the removal of identifying information, Deadspin contends that the December 7 Update could not have been perceived to be "of and concerning" the Armentas.[111] But the "of and concerning" standard does not require express, identifying language; rather, it may be satisfied if the statement refers to the

---

[107] Reply Br. 10.

[108] *Unbound Partners Ltd. P'ship*, 251 A.3d at 1023.

[109] *See Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility.'").

[110] Op. Br. 21.

[111] Op. Br. 21.

plaintiff by "reasonable implication."[112]   The plaintiff must also show that the statement was understood by a third person to have concerned them.[113]

Deadspin began the December 7 Update with edited language referencing their prior article versions about the "young fan" in the stands at the Chiefs game.[114] It then detailed how "someone in the stands" found a way to "disrespect two groups of people at once."[115]  Replacing "a Kansas City Chiefs fan" with "someone in the stands" reasonably implicates H.A. and his parents, Raul and Shannon.   The complaint sufficiently alleges facts whereby the December 7 Update may be considered an accusation that H.A. engaged in racist conduct despite the removal of his image and the references to Black face.

## II.   *FORUM NON CONVENIENS*

Deadspin also argues that this Court should exercise its discretion and dismiss this case under the doctrine of *forum non conveniens* because litigating in Delaware would be "unfair or inequitable to the parties or the Court."[116]   The Armentas respond that, because Deadspin has not met its burden to show overwhelming

---

[112] *Dickinson v. Cosby*, 250 Cal.Rptr.3d 350, 367 (Cal. Ct. App. 2019).

[113] *Id.* (citing *Bartholomew v. YouTube, LLC*, 225 Cal.Rptr.3d 917, 927 (Cal. Ct. App. 2017)).

[114] Joint Stipulation, Ex. 3.

[115] Joint Stipulation, Ex. 3.

[116] Op. Br. 22.

hardship, this Court should not grant dismissal based on *forum non conveniens*.[117]

While this Court has concluded that California law governs the substantive issues raised by the Armentas' defamation claims, Delaware procedural law controls.[118]

## A. The Doctrine of *Forum Non Conveniens*

The doctrine of *forum non conveniens* empowers this Court to "decline to hear a case despite having jurisdiction over the subject matter and the parties."[119]  This doctrine allows the Court to exercise some control over a foreign plaintiff's access to a forum in Delaware.[120]  Under Delaware law, dismissal on *forum non conveniens* grounds is left to this Court's discretion and is only granted in "rare case[s]."[121]  In evaluating Deadspin's motion, this Court considers the *Cryo-Maid* factors in the exercise of its discretion; these factors include:

> (1) the relative ease of access to proof; (2) the availability of compulsory process for witnesses; (3) the possibility of the view of the premises; (4) whether the controversy is dependent upon the application of Delaware law which the courts of this State more

---

[117] Resp. Br. at 20.  *General Foods Corp. v. Cryo-Maid*, 198 A.2d 681 (Del. 1964) and *Martinez v. E.I. DuPont de Nemours & Co.*, 86 A.3d 1102 (Del. 2014).

[118] *Dominion*, 2021 WL 5984265 at *18.

[119] *Chrysler First Business Credit Corp. v. 1500 Locust Ltd. Partnership*, 669 A.2d 104, 106 (Del. 1995).

[120] *Ison v. E.I. DuPont de Nemours and Co., Inc.*, 729 A.2d 832, 839-40 (Del. 1999) (examining doctrine of *forum non conveniens* and concluding that "[i]n Delaware jurisprudence there is a proper place for dismissals based on *forum non conveniens*.").

[121] *Aimbridge Hosp., LLC v. Plaza Resort Atlantic Ocean LLC*, 2024 WL 3949965, at *2 (Del. Super. Ct. Aug. 26, 2024).

properly should decide than those of another jurisdiction; (5) the pendency or nonpendency of a similar action or actions in another jurisdiction; and (6) all other practical problems that would make the trial of the case easy, expeditious and inexpensive.[122]

Dismissal on *forum non conveniens* grounds requires the movant show that "overwhelming hardship and inconvenience" would result if dismissal is not granted.[123] "It is not enough that all of the *Cryo-Maid* factors may favor defendant."[124] Depriving the plaintiff of their chosen forum requires the movant to "meet the high burden of showing that [the *Cryo-Maid*] factors weigh so heavily that the defendant will face 'overwhelming hardship' if the lawsuit proceeds in Delaware."[125] The overwhelming hardship standard is meant to be "stringent," but not "preclusive."[126]

[122] *Martinez,* 86 A.3d at 1104 (citing *Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1198-99 (Del. 1997)).

[123] *BCORE Timber EC Owner LP v. Qorvo US, Inc.*, 2023 WL 2985250, at *2 (Del. Super. Ct. Apr. 18, 2023).

[124] *Martinez,* 86 A.3d at 1104 (quoting *Chrysler First Bus. Credit Corp.,* 669 A.2d at 105).

[125] *Chrysler First Bus. Credit Corp.,* 669 A.2d at 105.

[126] *Martinez,* 86 A.3d at 1106.

## B. Deadspin Cannot Establish Overwhelming Hardship.

Where, as here, the Delaware action is the first action filed, the Court applies the overwhelming hardship standard.[127] Application of the *Cryo-Maid* factors reveals that Deadspin does not establish overwhelming hardship.

### 1. Relative Ease of Access to Proof

The Court first assesses "the relative ease of access to proof."[128] The Armentas' alleged harm, allegedly inflicted by an online publication, occurred primarily in California where they reside.[129] Deadspin, headquartered in New York and incorporated in Delaware, suggests this factor "overwhelmingly" weighs in favor of dismissal because neither the documentary evidence nor the witnesses are located in Delaware.[130] This argument is unavailing. Even if the documentary evidence stretches from New York to California, "modern methods of information transfer render concerns about transmission of documents virtually irrelevant."[131] And although the Armentas and out-of-state witnesses may eventually encounter

---

[127] *Martinez*, 86 A.3d at 1105-06 (citing *Williams Gas Supply Co. v. Apache Corp.*, 594 A.2d 34 (Del. 1991)).

[128] *Martinez,* 86 A.3d at 1104.

[129] Compl. ¶¶ 14-16.

[130] Op. Br. 25.

[131] *In re CVS Opioid Ins. Litig.*, 2022 WL 3330427, at *7 (Del. Super. Ct. Aug. 12, 2022) (quoting *Barrera v. Monsanto Co.*, 2016 WL 4938876, at *6 (Del. Super. Ct. Sept. 13, 2016)).

some inconvenience by proceeding in Delaware, there is also no one single forum that will be convenient for all parties and witnesses, who are scattered throughout the country.

## 2. Availability of Compulsory Process for Witnesses

The Court must consider whether "another forum would provide a substantial improvement as to the number of witnesses who would be subject to compulsory process."[132] Deadspin does not identify any witnesses whose testimony would be unavailable if this case proceeds in Delaware. To the contrary, California[133] and Delaware[134] have both adopted the Uniform Interstate Depositions and Discovery Act which provides Deadspin the necessary tools to compel depositions of any out-of-state witnesses.[135] Further, extant technology mitigates any inconvenience in case investigation and preparation; "video depositions or transcribed depositions can be taken at most places where non-[party] witnesses are located."[136] And because

---

[132] *Mt. Hawley Ins. Co. v. Jenny Craig, Inc.*, 668 A.2d 763, 769 (Del. Super. Ct. 1995).

[133] CAL. CIV. P. CODE § 2029.100 (West 2010), California Interstate and International Depositions and Discovery Act.

[134] 10 *Del.C.* § 4311, Delaware Uniform Interstate Depositions and Discovery Act.

[135] *See generally* CAL. CIV. P. CODE § 2029.100 (West 2010),

[136] *Chrysler Fin. Corp. v. Fruit of the Loom, Inc.*, 1992 WL 19945, at *2 (Del. Super. Ct. Feb. 4, 1992).

Deadspin is incorporated in Delaware, compulsory process is available for non-party witness, the author of the articles, Carron Phillips.

### 3. View of the Premises

The view of the premises generally holds "little to no weight even in a case where there was a relevant 'premises' that the fact-finder might want to view."[137] But here, this factor carries no weight because there is no premises to view or, viewed another way, the premises may be viewed anywhere the internet is available. To the extent that the published articles may be argued to constitute the "premises" upon which the tortious conduct was committed, the articles are readily available for review and examination.[138]

### 4. Application of Delaware Law

This Court next considers "whether the controversy is dependent upon the application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction."[139] When "important and novel issues" stem from a different state's law, that state is best positioned to determine the law's application.[140]

---

[137] *Hall v. Maritek Corp.*, 170 A.3d 149, 162 (Del. Super. Ct. 2017) (citation omitted).

[138] Joint Stipulation.

[139] *Martinez,* 86 A.3d at 1109.

[140] *Id.* at 1109-10.

Deadspin avers that California's retraction statute and anti-SLAPP law "represent important policy decisions" that should compel this Court to allow California an opportunity to decide this case.[141]  But Delaware courts are fully capable of applying California law and "often decide legal issues—even unsettled ones—under the law of other jurisdictions."[142]  The application of California law here is not sufficient reason to warrant dismissal under the doctrine of *forum non conveniens*.[143]

### 5.  Pendency of Similar Actions in Other Jurisdictions

Where, as here, there exist no other actions pending between the parties, "the plaintiff's choice of forum is accorded even more weight."[144]  The absence of other pending litigation between the Armentas and Deadspin therefore "weighs significantly against" granting Deadspin's *forum non conveniens* motion.[145]

---

[141] Op. Br. 29.

[142] *Berger v. Intelident Solutions, Inc.*, 906 A.2d 134, 137 (Del. 2006); *see Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1200 (Del. 1997) ("It is not unusual for courts to wrestle with [even] open questions of the law of sister states").

[143] *Berger*, 906 A.2d at 137.

[144] *Mar-Land Indus. Contractors, Inc. v. Caribbean Petroleum Refining, L.P.*, 777 A.2d 774, 778 (Del. 2001).

[145] *Berger*, 906 A.2d at 137.

### 6. All Other Practical Problems

The sixth and final *Cryo-Maid* factor examines "all other practical problems that would make the trial of the case easy, expeditious, and inexpensive."[146] Deadspin does not identify any "other" practical problems that are not covered by its arguments related to the preceding *Cryo-Maid* factors. Deadspin chose to establish its corporate home in Delaware. In so doing, it has availed itself of the benefits of this State. This self-selected domicile, too, serves to establish Delaware as a jurisdiction for resolving any suits against it. For this reason, and because the *Cryo-Maid* factors do not favor dismissal, Deadspin's motion to dismiss on the ground of *forum non conveniens* is denied.

---

[146] *BCORE Timber EC Owner LP*, 2023 WL 2985250, at *7.

## CONCLUSION

This case presents a challenging factual scenario that sits on the fine line between defamation and protected speech. Nonetheless, the complaint asserts sufficient facts under which recovery is conceivable, even when viewed through the more discerning lens applied to defamation claims. Deadspin has not established that no reasonable interpretation of the facts may entitle the Armentas to relief. And the Court does not find Deadspin will suffer an overwhelming hardship in defending itself in the State of its corporate home. Accordingly, Deadspin's motion to dismiss under Superior Court Civil Rule 12(b)(6) and (b)(3) is **DENIED**.